## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KELLI S.,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | **NO.   24-cv-5134** |
| | : | |
| **FRANK BISIGNANO,** | : | |
| **Commissioner of Social Security,** | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

**LYNNE A. SITARSKI**
**UNITED STATES MAGISTRATE JUDGE**                          **June 10, 2025**

Kelli S. ("Plaintiff") brought this action seeking review of the Commissioner of Social Security Administration's ("SSA") decision denying her claim for Social Security Disability Insurance under Title II of the Social Security Act, 42 U.S.C. §§ 401-433 (the "Act"). This matter is before me for disposition upon consent of the parties. For the reasons set forth below, Plaintiff's Request for Review (ECF No. 10) is **GRANTED**.

## I.     PROCEDURAL HISTORY

Plaintiff protectively filed the instant application for disability benefits on June 7, 2021, alleging disability beginning January 30, 2013, due to inflammatory arthritis, osteoarthritis and allied disorders, rheumatoid arthritis, depression, anxiety, balance issues, dizziness, high cholesterol, type 2 diabetes, and obesity. (R. 25, 68, 94, 284-85). Plaintiff's application was denied at the initial level on December 9, 2021, and upon reconsideration on May 27, 2022. (R. 94, 104). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (R. 157-59). Plaintiff—represented by counsel—as well as a vocational expert ("VE"), testified at the May 25, 2023, administrative hearing. (R. 43-67). On December 15, 2023, the ALJ issued a

decision unfavorable to Plaintiff.  (R. 22-42).  Plaintiff appealed, and the Appeals Council denied Plaintiff's request for review on August 13, 2024, thus making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  (R. 1-6).

On September 26, 2024, Plaintiff filed a complaint in this Court.  (Compl., ECF No. 1). On November 8, 2024, Plaintiff consented to my jurisdiction pursuant to 28 U.S.C. § 636(c). (Consent, ECF No. 5).  On March 3, 2025, Plaintiff filed a Brief and Statement of Issues in Support of Request for Review.  (Pl.'s Br., ECF No. 10).  The Commissioner filed a Response on March 26, 2025.  (Resp., ECF No. 11).  Plaintiff filed a Reply on April 9, 2025.  (Reply, ECF No. 12).

## II.    FACTUAL BACKGROUND

The Court has considered the administrative record in its entirety and summarizes here the evidence relevant to the instant request for review.  Plaintiff was born on September 18, 1964, making her 48 years old at her alleged onset date.  (R. 68, 284; Pl.'s Br., ECF No. 10, at 1).

### A.    Medical Evidence

On January 16, 2015, Plaintiff presented to Capital Health Medical Center's ("CHMC") primary care department in Lawrenceville, New Jersey complaining of back pain radiating to her abdomen.  (R. 443, 456).  At a follow-up appointment on March 14, 2015, she complained of swelling, pain, and redness in her right knee.  (R. 455).  She returned for a physical examination on November 14, 2016, at which time she was noted to have no palpitations, malaise, fatigue, weakness, back or neck pain, radicular symptoms, paresthesias, dizziness, or focal deficits, and she had normal sensation while retaining five out of five strength in her extremities.  (R. 447).

On February 11, 2019, Plaintiff presented to the emergency room at CHMC complaining of hip, knee, and spinal pain as well as an inability to ambulate. (R. 778). Eugene Lyubarov, P.A., evaluated Plaintiff and found no swelling or erythema in either knee, noted that Plaintiff had intact sensation in the hands and knees, and reported that Plaintiff had five out of five muscle strength and a normal range of motion. (R. 780). At the examination, Plaintiff reported smoking half a pack of cigarettes a day since the age of 15 and drinking three to four shots of vodka per day when she is able to. (R. 778). A subsequent CT scan did not reveal the source of Plaintiff's pain. (R. 791). Upon Plaintiff's discharge, it was noted that the "work up" for her joint pain was "unremarkable," her rheumatoid panel was "slightly positive," and that she was "okay" to go home with new medication for her pain and neuropathy. (R. 784).

On February 19, 2019, Plaintiff returned to CHMC for a follow-up appointment with Kristina Zarkua, M.D. Plaintiff complained of right hip, right knee, and left shoulder pain, neuropathy of her feet, and right knee swelling. (R. 661). Upon examination, Dr. Zarkua noted: mild right knee joint effusion; decreased thoracolumbar extension in Plaintiff's back; and that Plaintiff's anti-nuclear antibody, rheumatoid factor, and smooth muscle antibody levels were mildly elevated. (R. 663).

In May 2019, Plaintiff returned to CHMC for a follow-up regarding her joint pain. (R. 487). Plaintiff discussed her diagnoses of inflammatory polyarthropathy, rheumatoid arthritis, bursitis of her right elbow, hand joint pain, hypercalcemia, secondary hyperparathyroidism, and gout with Sajina Prabhakaran, M.D. (R. 488). She reported generalized pain, pain in her left elbow, joint pain, aching pain in her left wrist and fingers, extreme swelling in her right hand due to banging it on a treadmill, numbness, tingling, weakness, and morning stiffness. (R. 513-14). In August 2019 Plaintiff reported feeling better on prednisone and colchicine, and that when she did not take prednisone, she experienced flare-ups related to her arthritis. (R. 514-15). Dr.

Prabhakaran noted that Plaintiff had positive rheumatoid factor, elevated inflammatory markers, and tophaceous deposits in olecranon fossae, and presented with migratory polyarthritis involving both large and small joints.  (R. 515).  She also noted swelling of the third metacarpophalangeal joint in Plaintiff's right hand.  (*Id.*).

In November 2019, Plaintiff again reported generalized pain, joint pain, aching, and morning stiffness, though she was not in any acute distress at the time.  (R. 542-43).  A physical evaluation showed full range of motion in her spine and normal sensation, though she had some swelling in her fingers.  (R. 543).  Plaintiff still reported feeling better while on prednisone and colchicine.  (R. 543-44).  During a December 2, 2019, exam, Dr. Prabhakaran noted that Plaintiff reported having joint pain for about a year.  (R. 562).  According to Plaintiff, it began in her ankles, progressed to her right knee and toes, and ultimately made its way to her left elbow and wrist.  (*Id.*).  Dr. Prabhakaran discussed Plaintiff's symptoms of gout with her and recommended that she should make certain dietary changes to cope with her symptoms, including avoiding red meat and shellfish, and increasing her intake of water and low-fat dairy products.  (R. 563).

An x-ray of Plaintiff's right hand in April 2019 showed mild to moderate swelling but no erosive changes.  (R. 515, 517).  A CT scan of Plaintiff's right elbow in February 2020 showed soft tissue edema consistent with bursitis.  (R. 673).  However, a March 2020 MRI of the elbow showed normal joint alignment, no joint effusion, and no marrow signal or high-grade chondral abnormalities.  (R. 674).

On August 15, 2019, Plaintiff presented to Kathleen Bornhoeft, D.N.P, with CHMC. Bornhoeft noted Plaintiff displayed anxious mood and had limited range of motion in her hands, but otherwise presented normally.  (R. 533).  She diagnosed Plaintiff with gout, high serum ferritin, polycystic ovaries, fatigue, elevated blood pressure reading, tobacco dependence syndrome, paresthesia of lower extremity, vascular insufficiency, urgent desire to urinate,

alopecia areata, snoring symptoms, bilateral hearing loss, and generalized anxiety disorder. (R. 509-10).  She also opined that Plaintiff would be temporarily unable to perform work activities due to her medical conditions.  (R. 510).

Plaintiff presented to Danielle Carcia, D.O., of CHMC on September 22, 2020, complaining of swelling in her left wrist.  (R. 1033).  Plaintiff appeared well-nourished and ambulated normally, and Dr. Carcia did not observe edema or erythema in her extremities.  (*Id.*).  She noted that the inflammation in Plaintiff's left wrist was consistent with gout, and that the onset date for Plaintiff's gout and inflammatory polyarthropathy was August 23, 2019.  (R. 1033-36).  At a follow-up appointment on October 22, 2020, Plaintiff reported moderate alcohol consumption on a daily basis, though she also claimed to have stopped drinking due to health concerns.  (R. 1037).  On that date, Dr. Carcia observed a soft tissue mass on her right upper extremity, but no edema.  (R. 1038).  On November 30, 2020, Plaintiff returned for another follow-up appointment with Dr. Carcia.  Although Plaintiff had bandaged her left wrist, she ambulated normally, she had normal mood and affect, and was active and alert.  (R. 1043).  Dr. Carcia did not observe any edema but noted the soft tissue mass in Plaintiff's right upper extremity.  (*Id.*).  Plaintiff again reported that she had stopped drinking alcohol due to her health concerns.  (R. 1042).  On April 5, 2021, Dr. Carcia found that despite Plaintiff's complaints of fatigue, dizziness, leg pain bilaterally, and a gout flare-up in her left wrist, right thumb, and right elbow, there was no edema in any of her upper or lower extremities.  (R. 1048).  On August 5, 2021, Dr. Carcia found normal muscle tone and normal movement in all of Plaintiff's extremities.  (R. 1054).  On December 14, 2022, Plaintiff underwent a subclavian bypass due to recurring falls and dizziness.  (R. 807).  Dr. Carcia noted in January 2023 that Plaintiff was "feeling improved and healing as expected."  (R. 1257-58).

On August 29, 2022, Ewa Ruel, M.D., of CHMC examined Plaintiff.  She found that

5

Plaintiff: had good insight and judgment; had normal mood and affect; was active and alert; was oriented to time, person, and place; and did not have any edema in her extremities. (R. 719). Dr. Ruel also noted that Plaintiff's diabetes was well-controlled. (R. 720). Plaintiff reported weight gain to Dr. Ruel, who recommended certain lifestyle changes. (*Id.*).

Christine Lotto, M.D. with CHMC examined Plaintiff on September 12 and November 9, 2022. Plaintiff reported experiencing episodes of dizziness, falling at least three times per month, and regular gout flare-ups affecting her joints. (R. 736-37, 743-44). Plaintiff reported no muscle aches or weakness, no arthralgias/joint pain, no pain in her arms or back, no difficulty walking, and no swelling, numbness, or discoloration in her extremities. (R. 737, 743-44). On both occasions, Dr. Lotto observed that Plaintiff appeared healthy, well-nourished, and well-developed; ambulated normally; had normal mood and affect; and was alert and oriented to time, place, and person. (R. 737, 744). She also noted that Plaintiff's spine, arms, and legs appeared normal and her extremities did not have any ulcers or edema. (*Id.*). Dr. Lotto reviewed the results of a prior angiography which confirmed a proximal subclavian artery occlusion, and which was consistent with a marked difference in blood pressure between Plaintiff's right and left arms. (R. 738, 744). Dr. Lotto recommended a subclavian bypass to address the issues Plaintiff was experiencing in her left arm and ultimately performed the procedure on December 14, 2022. (R. 1004).

Denise Hare, an advanced practice nurse with CHMC, evaluated Plaintiff on April 28, 2023. (R. 1245-53). Hare noted that Plaintiff experienced persistent gout flare-ups twice per month in her right elbow and left wrist. (R. 1246, 1251). Plaintiff complained of pain and swelling in her right elbow and left wrist and Hare noted left wrist medial tenosynovitis and olecranon bursa wall thickening of both elbows with tenderness in the left elbow. (R. 1251-52). Plaintiff reported that colchicine seemed to help remediate her flare-ups. (R. 1251-52). Plaintiff

6

also reported that she had begun consuming alcohol and red meat again. (R. 1252). Hare opined that Plaintiff could: sit for no more than two hours in a day; stand or walk for less than one hour in a day due to balance issues; never lift or carry any amount of weight; never push or pull with either her upper or lower extremities; and never reach, handle, finger, or feel with her upper extremities. (R. 1245). Hare also opined that Plaintiff's pain and other symptoms: would constantly interfere with her focus and concentration throughout the day; necessitated excessive bathroom breaks; and would result in Plaintiff missing four or more days of work per month. (R. 1246). On that same date, Jillian Walsh, M.D., of CHMC examined Plaintiff and noted that she did not report any pain, shortness of breath, muscle aches, joint pain, or difficulty walking. (R. 1262).

On December 13, 2019, Corine Williams, a licensed psychologist, performed a consultative examination of Plaintiff. (R. 596-99). Williams observed that Plaintiff had normal posture, gait, and eye contact. (R. 597). Further, though she had a flat mood, Plaintiff had fair insight and judgment, her speech was goal-directed, she was alert and fully oriented, and she presented with a normal speech pattern, cadence, and prosody. (*Id.*). Plaintiff stated that she could groom and bathe herself, complete household chores, cook meals for herself, drive a car, and that she enjoyed knitting. (*Id.*). Williams noted that Plaintiff could manage her own finances. (R. 598). Ultimately, she diagnosed Plaintiff with depression and anxiety. (*Id.*).

On September 27, 2021, Ronald Bagner, M.D., performed a consultative physical examination of Plaintiff. (R. 618-25). Dr. Bagner observed that Plaintiff: ambulated with a cane but at a reasonable pace; got on and off the examination table with moderate difficulty; was uncomfortable in a seated position during the examination; had no sensory abnormality in her upper extremities; had normal movement in her right arm, but experienced pain in her right forearm; had swelling of the right index finger; had no motor or sensory abnormalities in her

7

lower extremities; and had normal range of movement and no effusion or swelling in her knees and ankles. (R. 620-21). He also noted that her left arm could not be examined due to acute inflammation in the elbow. (*Id.*). Dr. Bagner diagnosed her with gout and noted that evidence of acute inflammation due to gout was present. (R. 621).

On October 12, 2021, State agency consultant Leonard Nicosia, M.D., performed a consultative physical examination of Plaintiff. He opined that Plaintiff had the capacity to: lift and or carry 10 pounds frequently and 20 pounds occasionally; push and/or pull with both her upper and lower extremities without limitation; stand or walk up to four hours and sit for up to six hours in a typical workday; occasionally climb ramps, stairs, ladders, ropes, and scaffolds, balance, stoop, kneel, crouch, and crawl; and handle, finger, and feel without limitation. (R. 73-74). He also opined that Plaintiff was limited in her ability to reach in front, laterally, or overhead, and that she should avoid concentrated exposure to extreme cold, machinery, heights, and other hazards. (R. 74). He stated that Plaintiff had "gouty arthritis," which affected her ankles and elbows and limited her range of motion in her arms during flare-ups. (*Id.*). Upon reconsideration, State agency consultant Esther Tomor, M.D., agreed in large part with Dr. Nicosia's opinion, only differing in her opinion that Plaintiff could stoop frequently and did not need to avoid extreme cold. (R. 100-01).

On October 16, 2021, Kim Arrington, a licensed psychologist, performed a consultative examination of Plaintiff. At the examination, Plaintiff reported: that she had not seen a mental hea1th practitioner for several years; her medication helped her sleep; her appetite fluctuated; she experienced dysphoric moods, crying spells, fatigue, difficulty concentrating, feelings of hopelessness, thoughts of death, excessive worry, nightmares, flashbacks to unpleasant experiences, hypervigilance, panic attacks in social situations, and irritability; she isolated herself from others; and she had episodes of increased energy where she felt overstimulated and

8

unbalanced.  (R. 628).  Plaintiff also reported using alcohol to self-medicate at times.  (*Id.*).

Upon examination, Arrington found that Plaintiff was cooperative; her manner of relating, social

skills, and overall presentation were adequate; her motor behavior was normal and her eye

contact was good; her speech was intelligible and fluent and the quality of her voice was clear;

her expressive and receptive language skills were adequate; her thought process was coherent

and goal directed; her affect was depressed and her mood was dysthymic; her sensorium was

clear; she was oriented to person, place, and time; her attention and concentration were intact;

her recent and remote memory skills were mildly impaired; her intellectual functioning was

estimated in the average range; her general fund of information was appropriate; her insight was

fair; and her judgment ranged from fair to poor due to alcohol use.  (R. 629).  Arrington

diagnosed Plaintiff with major depressive disorder, anxiety disorder, and alcohol use disorder

and opined that Plaintiff was able to follow and understand simple directions and instructions,

would have difficulty performing complex tasks due to low motivation, and would have

difficulty maintaining a regular schedule.  (R. 629-30).  Arrington further opined that her

difficulties had the potential to significantly interfere with her ability to function on a daily basis.

(R. 629).

On November 9, 2021, State agency consultant Jocelyn Fierstien performed a

consultative psychological examination of Plaintiff and found that Plaintiff had the following

severe impairments: inflammatory arthritis; osteoarthritis and allied disorders; depressive,

bipolar, and related disorders; and anxiety and obsessive-compulsive disorders.  (R. 71).  She

also found that Plaintiff had the following non-severe impairments: all disorders of thyroid gland

(except malignant neoplasm); diabetes mellitus; and hyperlipidemia.  (*Id.*).  She opined that

Plaintiff had moderate limitations in her ability to concentrate, persist, or maintain pace and mild

limitations in her ability to understand, remember, or apply information, interact with others, and

adapt or manage herself. (R. 72). In conducting her examination, Fierstien noted that Plaintiff: presented as cooperative and intact, but with a depressed mood; adequately related; was coherent and goal-directed; was able to recall three out of three items immediately and two out of three after delay; and possessed average cognition. (R. 78). Plaintiff reported that she used computers, drove, cooked, handled her finances, and did laundry. (*Id.*). Ultimately, Fierstien opined that "[b]ased on available psych information [and] in absence of any substance abuse,[ Plaintiff was] able to perform basic tasks, sustain [concentration, persistence, and pace, and] relate and adapt to work-like settings." (*Id.*).

### B.    Nonmedical Evidence

The record also contains nonmedical evidence. Plaintiff testified at the May 25, 2023, administrative hearing as to her work history, the severity of her medical issues, and how those medical issues affected her functional capacity. (R. 45-62). She testified that she last worked in January 2013 as a "scoring specialist with the AICPA." (R. 50). Her highest level of education attained was one year of junior college. (R. 49).

Plaintiff stated that she stopped working in 2013 because she had "become a fall risk" due to joint swelling and dizziness. (R. 51). Between January 2013 and December 2019, Plaintiff's ability to stand and walk deteriorated to the point where she usually required her boyfriend's assistance to walk between rooms. (R. 53). According to Plaintiff, she would fall three to four times per month during this time. (R. 53). Plaintiff began ambulating with a cane in July or August 2021. (R. 52). Plaintiff stated that she used to be able to drive a car, but that she had trouble taking public transportation due to her physical limitations. (R. 55). However, she stopped driving around July 2022. (R. 55). She requires assistive devices in her bathroom and uses a walker to get from room to room. (R. 58). Plaintiff's boyfriend is responsible for performing all the household chores, including cooking, cleaning, and doing laundry. (R. 57).

Plaintiff testified that she experiences arthritic flare-ups two to three times per month, and that when they occur, her elbow swells to the size of golf balls. (R. 60). Her feet also swell during these episodes, and it is very difficult for her to walk. (R. 60). She testified that she had experienced these flare-ups since at least 2014, and that she takes medication for them. (R. 60).

Plaintiff noted that she experienced issues related to her heart, that she experienced heart palpitations, and that she had an arterial blockage that restricted blood flow to her brain. (R. 56). Because of these issues Plaintiff felt sluggish, unsteady, listless, and inert. (R. 56). Further, her physical issues in total impaired her ability to focus, pay attention, concentrate, and remember. (R. 56).

Regarding her depression and anxiety, Plaintiff testified that her symptoms included feeling confused and distracted, not being able to concentrate, and experiencing mood swings. (R. 53-54). She also had issues being in crowded, noisy environments. (R. 61). According to Plaintiff, she experienced "sensory overload" affecting her equilibrium, possibly triggering a fall. (R. 61).

Plaintiff also completed an adult function report on August 14, 2021, noting that she: could no longer stand, walk, concentrate for long periods of time or prepare meals; had joint pain and stiffness that affected her sleep; required assistance dressing, bathing, grooming, and feeding herself due to balance and mobility issues; and only ventured outside for medical appointments. (R. 356-60). She stated that her medical impairments affected her ability to lift, squat, bend, stand, reach, walk, kneel, climb stairs, remember, concentrate, and use her hands, but did not affect her ability to sit, talk, hear, see, complete tasks, understand, follow instructions, or get along with others. (R. 361). According to Plaintiff, she was limited to walking 500 feet at a time and would require roughly five minutes to rest afterwards to allow for her dizziness to clear. (*Id.*). Plaintiff also stated that she could pay attention for 30-minute periods with breaks in

11

between, could follow written instructions "fairly well" after reviewing them "a few" times, got along with authority figures well, handled stress "fair," and handled changes in routine poorly. (R. 361-62). Plaintiff noted that she was a fall risk, ambulated with a cane, and used a brace. (R. 362).

### III.    ALJ DECISION

Following the administrative hearing, the ALJ issued a decision in which he made the following findings:

1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 2019.

2.    The claimant did not engage in substantial gainful activity during the period from her alleged onset date of January 30, 2013 through her date last insured of December 31, 2019 (20 CFR 404.1571 *et seq.*).

3.    Through the date last insured, the claimant had the following severe impairments: Inflammatory Poly-arthropathy, Gout, Bursitis of the Right Elbow (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except never climb ropes, ladders or scaffolds; never be exposed to unprotected heights or hazardous machinery; occasionally

climb stairs and ramps; never crawl; occasionally kneel; occasionally stoop and

crouch; frequent reaching, fingering and handling; frequently balance; have

proximate access to restroom facilities.

6.  Through the date last insured, the claimant was capable of performing past

relevant work as an examination proctor. This work did not require the

performance of work-related activities precluded by the claimant's residual

functional capacity (20 CFR 404.1565).

7.  The claimant was not under a disability, as defined in the Social Security Act, at

any time from January 30, 2013, the alleged onset date, through December 31,

2019, the date last insured (20 CFR 404.1520(f)).

(R. 27-36).  Accordingly, the ALJ found Plaintiff was not disabled.  (R. 36).


## IV.    LEGAL STANDARD

To be eligible for benefits under the Social Security Act, a claimant must demonstrate to

the Commissioner that he cannot engage in substantial gainful activity because of a medically

determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of at least 12 months.  42 U.S.C. §

1382c(a)(3)(A).  A five-step sequential analysis is used to evaluate a disability claim:

> First, the Commissioner considers whether the claimant is currently
> engaged in substantial gainful activity.  If [she] is not, then the
> Commissioner considers in the second step whether the claimant has
> a "severe impairment" that significantly limits [her] physical or
> mental ability to perform basic work activities.  If the claimant
> suffers a severe impairment, the third inquiry is whether, based on
> the medical evidence, the impairment meets the criteria of the
> impairment listed in the "listing of impairments," . . . which result
> in a presumption of disability, or whether the claimant retains the
> capacity to work.  If the impairment does not meet the criteria for a
> listed impairment, then the Commissioner assesses in the fourth step

> whether, despite the severe impairment, the claimant has the residual functional capacity to perform [her] past work.  If the claimant cannot perform [her] past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

*Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000); *see also* 20 C.F.R. § 404.1520(a)(4).  The disability claimant bears the burden of establishing steps one through four.  If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner at step five to establish that, given the claimant's age, education, work experience, and mental and physical limitations, she is able to perform substantial gainful activities in jobs existing in the national economy.  *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007).

Judicial review of a final decision of the Commissioner is limited.  A district court is bound by the factual findings of the Commissioner if they are supported by substantial evidence and decided according to correct legal standards.  *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence is "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate."  *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118 (3d Cir. 2000) (citations omitted).  Even if the record could support a contrary conclusion, the decision of the ALJ will not be overruled as long as there is substantial evidence to support it.  *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).  The court has plenary review of legal issues.  *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999).

## V.    DISCUSSION

In her request for review, Plaintiff raises two issues: (1) the ALJ erred by failing to address Plaintiff's established mental limitations in the RFC; and (2) the ALJ erred in his evaluation of the medical evidence.  (Pl.'s Br., ECF No. 10, at 2).  This Court agrees with Plaintiff as to her first claim and agrees in part with Plaintiff as to her second claim.

A.        **Plaintiff's Mental Limitations**

1.        **The Parties' Arguments**

Plaintiff argues that the ALJ erroneously omitted her credibly established mental limitations from her RFC.  (Pl.'s Br., ECF No. 10, at 13).  She contends that the regulations require that the ALJ include all of Plaintiff's credibly established limitations in the RFC, regardless of whether they arise from severe impairments or non-severe impairments.  (*Id.* at 16 (citing 20 C.F.R. § 404.1545(a)(2))).  Based on this requirement, she contends that even though the ALJ found that Plaintiff's mental impairments were non-severe and that she had only mild limitations in the four functional areas, he was still required to include those limitations in the RFC or explain why they were omitted.  (*Id.*).

The Commissioner responds that the ALJ did in fact provide a valid explanation for omitting Plaintiff's mild limitations from her RFC.  (Resp., ECF No. 11, at 13).  He first highlights the ALJ's acknowledgment at the end of his step two analysis that the "paragraph B" mental function analysis was not an RFC assessment and the accompanying statement that "[t]he following residual functional capacity assessment reflect[ed] the degree of limitation [he] found in the 'paragraph B' mental function analysis."  (*Id.* at 13-14; R. 30).  The Commissioner next highlights the ALJ's statement that in assessing Plaintiff's RFC, he confirmed that such findings were made "[a]fter careful consideration of the entire record."  (*Id.* at 15 (citing R. 31)).  The Commissioner contends that "this level of articulation was 'sufficient to establish that the ALJ considered [mental] impairments before formulating the RFC.'"  (*Id.* at 14 (alteration in original) (quoting *Northrup v. Kijakazi*, No. 20-cv-412, 2022 WL 889968, at *5 (M.D. Pa. Mar. 24, 2022) (alteration in original))).

The Commissioner further points to the ALJ's rejection of certain medical opinions regarding Plaintiff's mental capacity in the RFC discussion, arguing that this analysis—apart

from the ALJ's aforementioned statements—was sufficient to satisfy his duty to provide a valid explanation for the RFC. (*Id.* at 14 (citing R. 34, 629)). Ultimately, the Commissioner contends that "read as a whole," the ALJ's opinion is sufficient. (*Id.* at 15).

Plaintiff replies that the "boilerplate" language deployed by the ALJ and relied upon by the Commissioner has previously been held to be insufficient. (Reply, ECF No. 12, at 6-7 (citing *Gunn v. Kijakazi*, 705 F. Supp. 3d 315, 332-33 (E.D. Pa. Dec. 4, 2023); *Wells v. Colvin*, 727 F.3d 1061 (10th Cir. 2013); *Carolyn A. v. Dudek*, No. 24-cv-1769, 2025 WL 824135, at *24-25 (E.D. Pa. Mar. 14, 2025))). Next, with respect to the ALJ's rejection of certain opinions related to her mental function during the RFC analysis, Plaintiff argues that "a finding that these opinions are not persuasive is not equivalent to an RFC finding," and that "[e]ven assuming these opinions are not persuasive, Plaintiff could still have less severe restrictions than what is called for in these opinions." (*Id.* at 5). In other words, though the ALJ rejected these medical opinions, he still ultimately found that Plaintiff had mild limitations in her mental functioning, and he was therefore required to include those limitations in the RFC or explain their omission. (*Id.* at 6).

For the reasons that follow, I agree with Plaintiff. Though the ALJ was permitted to find that Plaintiff only had mild limitation in the four functional areas, his subsequent RFC assessment failed to consider whether Plaintiff's mild limitations required a corresponding RFC limitation. As such, this matter is remanded for consideration of all of Plaintiff's medically determinable impairments in the formulation of the RFC.

### 2.    Analysis

Here, the ALJ determined that Plaintiff had no more than mild limitations in each of the four functional areas. (R. 29). In concluding as much, he noted Plaintiff's documented history of depression and anxiety as well as the fact that consultative examinations revealed mildly impaired memory. (*Id.*). He noted at step two of the analysis that his conclusion was not an

RFC assessment and that he was required to offer a more detailed assessment of Plaintiff's

mental limitations at steps four and five.  (R. 30).  He also stated "[t]he following residual

functional capacity assessment reflects the degree of limitation I have found in the 'paragraph B'

mental function analysis."  (*Id.*).  Then in assessing Plaintiff's RFC, he stated that he considered

"all symptoms and the extent to which th[o]se symptoms [could] reasonably be accepted as

consistent with the objective medical evidence and other evidence."  (R.31).  He added that in

considering Plaintiff's symptoms, he followed the two-step process in which he first determined

whether there existed an underlying medically determinable mental impairment, and then

evaluated the intensity, persistence, and limiting effects of Plaintiff's symptoms.  (*Id.*).  He

further confirmed that his findings were made "[a]fter careful consideration of the entire record."

(*Id.*).  However, in determining Plaintiff's RFC, the ALJ made no explicit mention of her mild

limitations that he found at step two, and his RFC assessment ultimately did not include any

mental limitations.  (R. 31-35).

The boilerplate language utilized by the ALJ at step two does not satisfy the requirement

contained in the social security regulations that the ALJ consider all impairments, even non-

severe ones, in formulating a claimant's RFC.  *See* 20 C.F.R. § 404.1545(a)(2); SSR 96-8p, 1996

WL 374184, at *4 (July 2, 1996) ("In assessing RFC, the adjudicator must consider limitations

and restrictions imposed by all of an individual's impairments, even those that are not

'severe.'"); *Wells*, 727 F.3d at 1068-69 (observing that "a conclusion that the claimant's mental

impairments are non-severe at step two does not permit the ALJ simply to disregard those

impairments when assessing a claimant's RFC and making conclusions at steps four and five");

*Balla v. Comm'r of Soc. Sec.*, No. 18-00386, 2019 WL 2482661, at *3 (D.N.J. June 14, 2019)

("passing reference" to mild mental limitations during discussion of State agency psychological

experts' opinions was insufficient because even though the impairments might impose only "*de*

*minimis*" limitations or "require minor modifications," it was not up to the court to "independently make" those findings) (citing and quoting *Curry v. Comm'r of Soc. Sec.*, No. 15-07515, 2017 WL 825196, at *4-6 (D.N.J. Mar. 2, 2017)); *Curry*, 2017 WL 825196, at *4-6 (same; mix of mild and moderate limitations); *Kich v. Colvin*, 218 F. Supp. 3d 342, 357 (M.D. Pa. 2016) (remanding ALJ decision that "made no explicit finding that the deficiencies were so minimal that they would not limit Plaintiff's ability to perform simple tasks," even though the ALJ determined that she would have only mild limitations if she stopped her alcohol use).  In *Patricia C. v. Saul*, in particular, the Southern District of California rejected precisely the language at issue here:

> Further, the ALJ's "boilerplate assertion . . . that his RFC assessment 'reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis' was not sufficient." *See Uranna G.* [*v. Saul*], 2019 WL 5342537, at *4 [(S.D. Cal. 2019)]. The ALJ does not articulate why, after finding that Plaintiff had mild mental limitations in each of the four broad categories, he did not include any restrictions related to those limitations in the RFC. The Court will not infer in a vacuum that the ALJ considered Plaintiff's mild mental limitations but then validly concluded that they did not cause any significant limitation necessitating inclusion in the RFC. *See Gates v. Berryhill*, No. ED CV 16-00049 AFM, 2017 WL 2174401, at *3 (C.D. Cal. May 16, 2017) (rejecting the Commissioner's argument that one can "infer" that the ALJ considered plaintiff's mild mental limitations as inconsistent with *Hutton* [*v. Astrue*, 491 F. App'x 850 (9th Cir. 2012).)].

19-cv-00636-JM-JLB, 2020 WL 4596757, at *13 (S.D. Cal. Aug. 11, 2020), *report and recommendation adopted sub nom. Craig v. Saul*, 2020 WL 5423887 (S.D. Cal. Sept. 10, 2020).

The Commissioner contends that the ALJ did not completely ignore Plaintiff's mental RFC at step four because he set out the opinions of certain medical sources on the topic and ultimately rejected them.  (Resp., ECF No. 11, at 13-18 (citing R. 34 (rejecting the opinions of Fierstien and Arrington regarding Plaintiff's mental RFC))).  Specifically, in rejecting Fierstien's

opinion that Plaintiff had moderate limitations in her ability to concentrate, persist, or maintain pace and Arrington's opinion that Plaintiff had difficulty performing complex tasks due to low motivation and maintaining a regular schedule, and that her mental condition might significantly interfere with her ability to function on a daily basis, the ALJ stated: "the mental status examinations do not support moderate limitations because they were mostly normal," and "even Dr. Arrington's own consultative examination showed only 'mildly' impaired memory and intact attention and concentrations." (R. 34). As Plaintiff notes, these statements only suffice to support the ALJ's rejection of "moderate" mental limitations in favor of finding mild limitations in the four functional areas. But they do not address how these mild mental limitations might or might not manifest in Plaintiff's overall RFC, even though, as stated above, the regulations require the ALJ to do so. 20 C.F.R. § 404.1545(a)(2); SSR 96-8p, 1996 WL 374184, at *4. Therefore, the ALJ erred.

On remand, the ALJ may determine that Plaintiff's mild mental limitations warrant only *de minimis* or even no corresponding restrictions in the RFC, but it is not the province of the Court to make that determination here. *Balla*, 2019 WL 2482661, at *3; *Curry*, 2017 WL 825196, at *4-6.

**B.      The ALJ's Treatment of the Medical Evidence**

**1.      The Parties' Arguments**

Plaintiff also argues that the ALJ erred in his treatment of Hare's opinion. (*Id.* at 2-4). In rejecting her opinion, the ALJ stated the opinion was not supported, not persuasive, and extreme in light of the evidence. (R. 34). In doing so, he offered two reasons for his conclusion: (1) according to Hare's own examination, Plaintiff was well enough to consider drinking alcohol again and increasing her intake of red meat; and (2) Plaintiff reported no swelling or joint pain and was doing well following the December 2022 subclavian bypass surgery. (R. 34-35).

19

Plaintiff takes issue with both, arguing that neither reason constitutes substantial evidence to support the ALJ's finding that Hare's opinion was unpersuasive. (Pl.'s Br., ECF No. 10, at 4-5 (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118 (3d Cir. 2000))).

First, Plaintiff argues that: (1) no evidence existed that Plaintiff knew that increased consumption of alcohol and red meat would make her gout symptoms worse; (2) even if she was aware of this connection, the record does not support the inference that she began consuming alcohol again because her gout had improved; and (3) because Plaintiff has a documented substance abuse disorder there may have been other, addiction-related reasons for her decision to begin consuming alcohol and red meat again, and the ALJ was therefore required to engage in a separate analysis regarding whether Plaintiff was able to control her intake of alcohol and red meat. (*Id.* at 5-6).

Second, she argues that the ALJ's statements that Hare's physical evaluation showed that Plaintiff reported no joint pain or swelling and that she was doing well after her surgery are belied by the record, as Hare in fact noted that Plaintiff complained of these symptoms. (*Id.* at 6-7 (citing R. 1251)). At this examination, Hare expressly noted that Plaintiff complained of joint pain and swelling in her right elbow and left wrist, exhibited left wrist medial tenosynovitis and tenderness to palpation, olecranon bursa wall thickening at both elbows with slight tenderness on the left and palpable tophus on the right, possible tophus in her right index finger, left ankle tenderness, and limited range of motion due to tophus deposits. (R. 1252). Plaintiff notes that the ALJ's citation in this section of his opinion was not to Hare's examination, but to Dr. Walsh's on the same day. (*Id.* at 6-7). Plaintiff acknowledges that Dr. Walsh stated that Plaintiff did not report chest or arm pain on exertion or any swelling in her extremities. (R. 1262). However, she emphasizes that Hare expressly noted that Plaintiff reported joint pain and swelling. (Pl.'s Br., ECF No. 10, at 6-7). Ultimately, Plaintiff argues that Hare's observations

were more consistent with the rest of the medical evidence in the record, and the ALJ erred in failing to adopt the greater limitations determined by her. (*Id.* at 7).

Similarly, Plaintiff also argues that the ALJ failed to compare the relevant medical opinions to one another. (*Id.* at 8). Citing to several medical notes and opinions, she states that her gout was well-documented throughout the medical record. (*Id.* at 7-12 (citing to the notes and opinions of Drs. Bagner, Zarkua, Prabhakaran, Carcia, and nurses Hare and Bornhoeft)). Plaintiff contends that the ALJ erred in rejecting Hare's opinion as it was actually consistent with the rest of the record. (*Id.* at 7). Specifically, she maintains that based on Dr. Bagner's observations that Plaintiff required a cane to ambulate, complained of dizziness problems, and had acute inflammation of her extremities due to gout, Hare's findings that Plaintiff could only stand or walk for less than an hour per day and was limited in her ability to lift and carry were reasonable. (*Id.*). Ultimately, Plaintiff argues that if the ALJ had appropriately evaluated the supportability and consistency of Hare's opinion, he may not have found it unpersuasive. (*Id.* at 12).

The Commissioner responds that the ALJ fully summarized Plaintiff's treatment history, considered the relevant record evidence, evaluated the medical source opinions in accordance with the regulations, and provided a reasonable rationale for his decision. As for Hare's opinion specifically, the Commissioner contends first that it is unclear how much weight this opinion should be afforded as it was rendered in April 2023, four years after Plaintiff was last insured and ten years after the alleged onset of her disability. (Resp., ECF No. 11, at 8).[1] Second, the Commissioner notes that Plaintiff was in fact counseled as to the negative effects that red meat and alcohol could have on her symptoms of gout, and it was therefore reasonable for the ALJ to

---

[1] The Commissioner makes a similar argument regarding Plaintiff's citation to Dr. Bagner's opinion, as it was rendered in September 2021. (Resp., ECF No. 11, at 8 n.5).

infer, based on her willingness to consume those substances, that the symptoms related to her gout were improving, especially given that Plaintiff told Hare she continued to feel better while taking prednisone and colchicine. (*Id.* at 9). Third, the Commissioner points out that although Hare noted complaints of pain and swelling in her examination notes on April 28, 2023, Walsh noted the opposite in her examination notes from the same day. (*Id.*). Based on this, and "against the broader record of evidence," the Commissioner argues that "there is little medical evidence until 2015" illustrating Plaintiff's alleged disability. (*Id.* at 10). Finally, to the extent that the record would illustrate varying degrees of pain and swelling throughout the course of her treatment, the Commissioner contends that "[i]t is well-settled that a claimant need not be pain free or experiencing no discomfort to be found not disabled." (*Id.* at 11 (citing *Welch v. Heckler*, 808 F.2d 264, 270 (3d Cir. 1986))).

Plaintiff replies that two of the Commissioner's arguments on brief are post hoc rationalizations that this Court should not consider. (Reply, ECF No. 12, at 2 (citing *Fongsue v. Saul*, No. 20-574, 2020 WL 5849430 (E.D. Pa. Sep. 30, 2020))). Specifically, she notes that the ALJ did not purport to rely on the fact that Hare's opinion was rendered after Plaintiff's date last insured, or the fact that it was based on Plaintiff's subjective complaints. (*Id.*).

### 2.    Analysis

First, Plaintiff's contention that she was unaware that consuming red meat and alcohol could exacerbate her symptoms of gout is belied by the record, as she was informed of this fact and counseled to abstain from consuming them on multiple occasions. (*See, e.g.*, R. 507, 551, 563, 1252). It is a permissible inference that a claimant's decision not to adhere to prescribed treatment is evidence that the claimant is not disabled. *See* 20 C.F.R. § 404.1530(a) ("In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work."); *see also Brown v. Bowen*, 845 F.2d 1211, 1215 (3d

Cir. 1988) (failure to comply with treatment regimen supported the ALJ's finding that claimant

was not disabled); *Dearth v. Barnhart*, 34 F. App'x 874, 875 (3d Cir. 2002) ("If a symptom can

be reasonably controlled by medication or treatment, it is not disabling.") (quoting *Gross v.*

*Heckler*, 785 F.2d 1163, 1165-66 (4th Cir. 1986)).[2]  Therefore, the ALJ did not err in this

respect.

However, Plaintiff is correct that the ALJ's treatment of Hare's opinion was erroneous

insofar as the ALJ misstated its substance, precluding him from properly weighing or evaluating

it against the other record evidence.  Further, this error was not harmless as Hare's opinion

contained greater restrictions and ultimately contradicted the ALJ's RFC determination.

As Plaintiff points out—and the Commissioner concedes—the ALJ cited to Dr. Walsh's

opinion, not Hare's, when observing that Plaintiff denied any pain or swelling in her extremities.

The ALJ relied on this fact in finding Hare's opinion unpersuasive.  (R. 34-35).  However, as

Plaintiff notes, Hare expressly stated the opposite—that Plaintiff experienced persistent gout

flare-ups twice per month in her right elbow and left wrist, and that she complained of pain and

swelling at her exam.  (R. 1246, 1251).  This mistake—a mischaracterization of the evidence—

prevented the ALJ from properly weighing Hare's medical opinion.  *See Flynn v. O'Malley*, No.

---

[2]  Plaintiff also hints that the ALJ was required to engage in a separate analysis of her substance abuse disorder pursuant to 20 C.F.R. § 404.1535, to determine "[whether the claimant was] addicted to alcohol and, as a consequence, has lost the ability to control its use."  (Pl.'s Br., ECF No. 10, at 6 (alteration in original) (quoting *McShea v. Schweiker*, 700 F.2d 117, 119 (3d Cir. 1983))).  As Plaintiff notes, it is unclear the extent to which the ALJ relied upon her alcohol consumption in coming to his disability determination, and whether he in fact engaged in the proper analysis pursuant to 20 C.F.R. § 404.1535.  The ALJ found that Plaintiff's alcohol abuse disorder was a medically determinable impairment, but also noted that it was "non[-]severe" as it did not cause more than minimal limitation in her ability to perform basic mental work activities.  (R. 28-29).  Because this Court finds that ALJ erred in other respects and remands the case for further consideration on those bases, the Court declines to address this ancillary contention but notes that on remand, the ALJ should also state the extent to which he considered Plaintiff's alcohol intake and engage in any necessary analysis pursuant to 20 C.F.R. § 404.1535.

22-3285, 2024 WL 1320992, at *9 (E.D. Pa. Mar. 27, 2024) (the ALJ may not mischaracterize

evidence or reject opinion evidence for no reason or the wrong reason) (citing *Rutherford v.*

*Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005); *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir.

1999)).

      The Commissioner attempts to save the ALJ's determination on this point by arguing

that: (1) Hare's opinion was not entitled to any weight given the timing of its issuance years after

the date last insured; and (2) because Dr. Walsh's treatment notes contain the opposite finding

regarding pain and swelling any such error the ALJ may have made in mischaracterizing Hare's

opinion was harmless.  (Resp., ECF No. 11, at 9).  Both arguments are unavailing.

      First, in making his RFC assessment, the ALJ did not actually purport to rely on the

timeliness of Hare's opinion in rejecting it, (R. 34-35), and courts are not allowed to rely on

after-the-fact justifications by the Commissioner to bolster an ALJ opinion that does not

adequately deal with contrary evidence.  *See Fongsue v. Saul*, No. 20-574, 2020 WL 5849430, at

*8 (E.D. Pa. 2020) ("[T]his court is constrained to review only the ALJ's reasoning, not the post

hoc arguments propounded by Defendant after the ALJ's decision.") (citing *Fargnoli v.*

*Massanari*, 247 F.3d at 44 n.7); *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 87 (1943)

("The grounds upon which an administrative order must be judged are those upon which the

record discloses that its action was based."); *Teada v. Comm'r of Soc. Sec.*, No. 19-4537, 2020

WL 1953660, at *2-3 (E.D. Pa. 2020) (citations omitted).  Second, the Commissioner's argument

that the presence of Dr. Walsh's medical notes renders the ALJ's error harmless misunderstands

the nature of the ALJ's duties, as factfinder.  The ALJ is *required* to consider each medical

source opinion, weigh the evidence, and if the evidence conflicts, explain why he accepted one

opinion over another.  *See* 20 C.F.R. §§ 404.1520b, 404.1520c; *Mason v. Shalala*, 994 F.2d

1058, 1067 (3d Cir. 1993) ("An ALJ 'may not reject [a physician's findings] unless he first

weighs them against other relevant evidence and explains why certain evidence has been accepted and why other evidence has been rejected.'") (alteration in original) (quoting *Kent v. Schweiker*, 710 F.2d 110, 115 n.5 (3d Cir. 1983)).  Here, the ALJ could not have meaningfully weighed the evidence as he was mistaken about what the evidence actually was.  *See Karstetter v. Kijakazi*, No. 20-1603, 2022 WL 16855565, at *9 (M.D. Pa. Nov. 10, 2022) (vacating the decision of the ALJ where "the ALJ relied upon mischaracterized evidence as the basis upon which he found medical opinions or portions thereof unpersuasive").  Therefore, the ALJ erred in his treatment of Hare's opinion.

## VI.    CONCLUSION

For the reasons set forth above, Plaintiff's request for review is **GRANTED**, and the matter is remanded for further proceedings consistent with this memorandum.  An appropriate Order follows.

BY THE COURT:

  /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
United States Magistrate Judge